1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

12    LEON JAMES PAGE,                            CASE NO. 12-CV-198 JLS (WMC)

13                                               **ORDER: REMANDING CASE**

14                                  Plaintiff,

          vs.
15

16

17    TRI-CITY HEALTHCARE DISTRICT,

18

19                                  Defendant.

20          Presently before the Court is Plaintiff Leon James Page's ex parte motion for a temporary

21    restraining order and order to show cause in this action against Defendant Tri-City Healthcare

22    District ("Tri-City" or "the District").  (Mot. for TRO, ECF No. 4.)  Also before the Court are Tri-

23    City's opposition (Opp'n to TRO, ECF No. 5), supplemental briefing from both parties in response

24    to the Court's request (Pl.'s and Def.'s Supp. Briefs, ECF Nos. 8, 9), and various objections and

25    declarations filed by the parties (ECF Nos. 10, 13, 14, 15, 17.)  Defendant has also filed a motion

26    in this case "to strike first, second, and fourth claim for relief," alleging Plaintiff's complaint

27    constitutes a Strategic Lawsuit Against Public Participation ("SLAPP").  (Anti-SLAPP Mot.,

28    ECF No. 3.)

## BACKGROUND

Plaintiff is a "taxpayer and resident" of the City of Carlsbad, California.  (Compl. ¶ 4, Ex. A to Notice of Removal, ECF No. 1.)  Defendant Tri-City is a public healthcare district organized under California law, serving the cities of Carlsbad, Oceanside, and Vista, and surrounding unincorporated areas.  (Compl. ¶ 5.)  Tri-City is governed by a Board of Directors, which consists of seven elected officials who serve four-year terms.[1]  (*Id.* at ¶¶ 6-7.)  These terms are staggered such that three Director positions are filled in one election, and the other four are elected two years later.  (*See* Def.'s Supp. Brief 6; Moser Supp. Decl. 2, Ex. 1 to Def.'s Supp. Brief.)  The Directors are elected at-large, using a system whereby all candidates for the Board of Directors run for all of the positions up for election that term, with each voter able to vote for multiple candidates up to the total number of available positions; the open positions are filled by the three or four candidates receiving the greatest number of votes.[2]  (*Id.*)  In 2010, Randy Horton was elected to one of three available positions on the Board of Directors, receiving 25,508 votes (including Plaintiff's), which constituted 16.1% of the total votes, placing Horton second in a field of seven candidates.  (Compl. ¶ 7; Moser Supp. Decl. 2.)  His four-year term expires in 2014.

After Director Horton assumed his duties as a member of the Board, events occurred which are the subject of the instant lawsuit.  On April 28, 2011, in closed session[3], a majority of the Board members voted to prohibit Director Horton from participating and voting in closed session meetings of the Board for a six-month censure period.  (Compl. ¶ 11; Anti-SLAPP Mot. 10.)  Director Horton was present at this meeting, at which Chief Executive Officer Larry Anderson

---

[1] Currently, these Board members and their respective positions are: RoseMarie Reno, Chairperson; Larry Shallock, Vice Chairperson; Cyril Kellett, Secretary; George Coulter, Treasurer; Charlene Anderson, Assistant Secretary; Randy Horton, Member; and Kathleen Sterling, Member. (Compl. ¶ 6.)

[2] This system may be contrasted with other types of at-large multi-member board election systems, such as numbered-post systems, in which each candidate specifies one position for which he is running, and cumulative voting schemes, in which each voter has as many votes as there are posts to be filled but may cast multiple votes for a single candidate.  *See League of United Latin American Citizens, District 19 v. City of Boerne*, 659 F.3d 421, 426-27 n.1, n.3 (5th Cir. 2011) (detailing these three types of voting systems).

[3] Plaintiff admits closed sessions are authorized by California law.  (Mot. for TRO 7) (citing Cal. Gov. Code § 32155, 32106).

described "what he believed to be improper releases of closed session, attorney-client privileged and trade secret information by Mr. Horton." (Anti-SLAPP Mot. 10.) Director Horton apparently did not rebut these allegations at that meeting, and chose to abstain in the vote on his censure. (*Id.*) After the censure resolution passed, Director Horton left the closed session. (*Id.*)

On May 26, 2011, the Board met again to consider Director Charlene Anderson's request that the Board impose sanctions upon Mr. Horton for "alleged violations of California law and alleged violations of District policies," including conduct that took place both before and after Director Horton assumed his role on the Board. (*Id.*) Director Anderson claimed Director Horton had disclosed further confidential Board information on several occasions in violation of the Board's confidentiality policy, Policy No. 10-022, and that he had made false and defamatory statements to the public on several occasions in violation of his professional duties as a certified public accountant. (*Id.*) The Board approved the requested sanctions by majority vote, invoking the Board's code of conduct, Policy No. 10-039, as its basis for imposing sanctions. (*Id.* at 10-11.) These sanctions included the temporary suspension of Director Horton's stipend for attendance at meetings during his censure, and the determination that the District would not indemnify Director Horton should he face liability "resulting from" this misconduct.[4] (*Id.*)

Pursuant to these disciplinary decisions, Director Horton was prohibited from attending and voting in at least eleven closed session meetings, and was not paid a stipend for these meetings.[5] (Compl. ¶ 12-4; Mot. for TRO 8.) Plaintiff, apparently a concerned citizen, voiced his objections to the Board's censure of Director Horton in a letter sent to the District on October 15, 2011. (Compl. ¶ 5.) In this "cease and desist letter," Plaintiff stated he would sue the District as a "taxpayer representative" if the District did not stop excluding Director Horton from closed session meetings.

At a meeting held on October 27, 2011, the day before the six-month censure period was scheduled to elapse, the Board noted that the censure period for Director Horton was about to

---

[4] The parties agree that, to date, Director Horton has not faced liability or sought indemnity in any lawsuit arising out of this misconduct. (*See* Anti-SLAPP Mot. 11.)

[5] Plaintiff lists the dates for these closed session meetings, which took place between May 26, 2011 and October 4, 2011. (*See* Mot. for TRO 8.)

expire but did not extend the censure.  (Anti-SLAPP Mot. 11.)  However, Plaintiff states that Director Anderson delivered to the Board "an inflamatory (sic) renunciation of Director Horton and Director Kathleen Sterling in which he accused them of placing the interests of their constituents above those of the District, of being 'double agents' and violating new hospital policies he sponsored requiring the elected Director/Trustee to be 'loyal' and 'obedient.'" (Compl. ¶ 24.)  The Board then decided that, going forward, it would decide whether to allow Director Horton to participate and vote in closed sessions on a case-by-case basis, to be determined by majority vote immediately before each future closed session meeting.  (*Id.*)

At the next Board meeting on December 20, 2011, Director Horton was asked to sign a confidentiality pledge regarding information disclosed during closed session, but he refused. (Anti-SLAPP Mot. 11.)  According to Tri-City, this pledge is "the same confidentiality acknowledgment that all District employees, committee members and Board members sign."[6] (Def.'s Supp. Brief 1.)  Indeed, the Board's confidentiality policy, Policy No. 10-022, states that each Board member shall sign the pledge immediately after their initial appointment to office. (*See* Confidentiality Policy, Ex. 2 to Def.'s Supp. Brief, ECF No. 8-1.)  At oral argument, both parties agreed that the other Board members have signed the pledge.  However, in objection to Tri-City's assertions to the contrary, Plaintiff argued that it remained an open question whether Director Horton would be let in to subsequent meetings after signing the pledge, and that the Board's actions could not be predicted.

After Director Horton refused to sign the pledge, the Board then voted to exclude him from all of the matters heard in the closed session meeting except for agenda item (e), relating to "certain real property negotiations."  (Compl. ¶ 25.)  As a result, Director Horton was excluded from participating in: "(a) a hearing on the reports of the Hospital Medical Audit or Quality Assurance Committees; (b) a conference with legal counsel on four (4) matters of litigation; (c) a //

---

[6] Tri-City has attached a copy of the confidentiality pledge to its Supplemental Brief.  (Pledge, Ex. 2 to Def.'s Supp. Brief, ECF No. 8-1.)  Tri-City states the purpose of the form is "to protect patient medical information and other information protected by privacy and confidentiality laws.  The form does not ask that the signor swear his loyalty or oath to the District."  (Moser Supp. Decl. 3.)

1   conference with legal counsel concerning exposure to litigation; and (d) approval of prior board

2   closed session minutes."  (*Id.*)

3          Subsequent to this December 20, 2011 exclusion, Director Horton was also excluded on an

4   ad-hoc basis from at least portions of closed session meetings on January 26, 2012, and February

5   1, 2012.  (Mot. for TRO 8.)  According to Plaintiff, the District "spends public money to contract

6   with private security personnel for the illegal purpose of physically preventing Director Horton

7   from representing his constituents and voting during closed session meetings of the District's

8   Board of Directors."  (*Id.* at 8-9.)  Director Horton has also been denied access to the minutes of

9   any closed session meetings from which he was excluded.  (*Id.* at 9.)

10          Plaintiff brought this action in superior court on December 27, 2011, stating four causes of

11   action against the District under state and federal law, alleging that he, along with other members

12   of the voting public, have been disenfranchised and "denied meaningful representation on

13   District's Board of Directors" by the Board's actions with regard to Director Horton.

14   (Compl. ¶ 16.)  Plaintiff further alleges that the District's actions were taken "in retaliation against

15   Director Horton for his First Amendment-protected activities in an effort to unlawfully chill his

16   public participation and comments during and concerning official proceedings of the District's

17   Board of Directors."  (Compl. ¶ 17.)

18          Tri-City claims it was not served with Plaintiff's complaint.  (Opp'n to TRO 1.)  Rather, on

19   January 24, 2012, Tri-City received an email from Plaintiff's counsel, containing the complaint

20   and ex parte papers seeking an injunction against the District.  (*Id.*)  The hearing on the ex parte

21   motion was set for Thursday, January 26, 2012, the same day as a regularly scheduled meeting of

22   the Board of Directors.  However, on Wednesday, January 25, 2012, Tri-City removed the case to

23   federal court based on Plaintiff's federal claim under 28 U.S.C. § 1983.  (*Id.*; *see also* Notice of

24   Removal.)  On January 31, 2012, Tri-City filed its Anti-SLAPP motion to strike.  On February 2,

25   2012, Plaintiff filed the instant ex parte application for a temporary restraining order and order to

26   show cause before this Court, alleging irreparable harm based on the District's ongoing denial of

27   his right to the equal protection of the law each time Director Horton, his "duly elected

28   representative," is excluded from the closed session meetings of the Board.  (Mot. for TRO 12.)

1    Plaintiff requests the Court enjoin the District from: "(1) excluding Director Randy Horton

2  from closed session meetings of District's Board of Directors; and (2) denying Director Horton the

3  same rights, privileges, and powers afforded to other duly-elected Members of District's Board of

4  Directors."  (Pl.'s Supp. Brief 7.)

5                                              **LEGAL STANDARD**

6    Temporary restraining orders are governed by the standard applicable to preliminary

7  injunctions.  *See* Fed. R. Civ. P. 65.  A plaintiff seeking a preliminary injunction must establish

8  that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

9  of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

10  public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Sierra*

11  *Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).  Although all four factors must be met,

12  they operate on a sliding scale.  "Under this approach, the elements of the preliminary injunction

13  test are balanced, so that a stronger showing of one element may offset a weaker showing of

14  another."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  For

15  example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of

16  likelihood of success on the merits."  *Id.* at 1135.

17    A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

18  clear showing that the plaintiff is entitled to such relief."  *Winter v. NRDC*, 555 U.S. at 22.  The

19  typical preliminary injunction is prohibitory, and seeks to "maintain the status quo pending a trial

20  on the merits."  *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89 (2d Cir. 2006); *see also Marlyn*

21  *Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-89 (9th Cir. 2009).  A

22  mandatory injunction, in contrast, "orders a responsible party to take action . . . [and] goes well

23  beyond simply maintaining the status quo."  *Marlyn Nutraceuticals*, 571 F.3d at 879 (internal

24  quotations and citations omitted).  In this context, the "status quo" refers to "the last, uncontested

25  status which preceded the pending controversy."  *Id.*  Mandatory injunctions are particularly

26  disfavored, and should not be granted "unless extreme or very serious damage will result."  *Id.*

27  //

28  //

**ANALYSIS**

Before discussing the merits of Plaintiff's underlying claims and corresponding request for a temporary restraining order, the Court must determine if it has the power to entertain this suit at all. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) (stating that finding a justiciable case or controversy is "the threshold question in every federal case.") It is axiomatic that under Article III of the United States Constitution, a federal court may only adjudicate an action if it constitutes a justiciable "case" or a "controversy" that has real consequences for the parties. *Raines v. Byrd*, 521 U.S. 881, 818 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). One of the baseline requirements for justiciability in federal court is that the plaintiff have standing to assert the claims brought. *Id.; see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("Article III standing enforces the Constitution's case-or-controversy requirement") (citations omitted). Because Plaintiff now asserts federal jurisdiction, he bears the burden of establishing he has standing to invoke the authority of a federal court.[7] This burden tracks the manner and degree of evidence required at each successive stage of litigation. *Lujan*, 504 U.S. at 561. Thus, at the preliminary injunction stage, Plaintiff must make a "clear showing" that he has standing. *Winter v. NRDC*, 555 U.S. at 22; *see also Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

The essence of the standing inquiry is determining whether the party seeking to invoke the Court's jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Three elements form the core, essential, or unchanging part of the standing requirement, which are derived directly from Article III:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be

---

[7] Although it is true that Defendant removed the case from state court to federal court, Plaintiff has not challenged that removal and now asks the Court to grant equitable relief. The party asserting federal jurisdiction when it is challenged has the burden of establishing it. *DaimlerChrysler*, 547 U.S. at 342 n. 3.

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-561 (internal quotations, citations and footnote omitted). This irreducible constitutional minimum, often termed "Article III standing," seeks to limit the reach of the judiciary into matters properly reserved for other branches of government and to maintain the critical balance of power at the heart of the tripartite government established by the United States Constitution. *See DaimlerChrysler*, 547 U.S. at 341; *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982). Although the Supreme Court has noted that "the concept of 'Art. III standing' has not been defined with complete consistency," *Valley Forge*, 454 U.S. at 475, these three basic requirements of injury, causation, and redressability are uniformly essential.

In addition to these constitutional requirements, the Supreme Court has elaborated a set of "prudential" considerations that bear on the question of standing. *Warth v. Seldin*, 422 U.S. at 501. Two of these, of particular relevance to the case at bar, include whether the plaintiff should be able to assert the rights of third parties who are not part of the lawsuit, *Craig v. Boren*, 429 U.S. 190, 193-94 (1960), or a generalized social grievance where the only injury is the concern, shared between all citizens, with having the government follow the law, *Allen v. Wright*, 468 U.S. 737, 750 (1984). Although prudential concerns may give way in certain circumstances, such as when Congress creates standing by statute, the Article III "bedrock" requirements form an absolute constitutional barrier to federal court jurisdiction. *Raines v. Byrd*, 521 U.S. at 818-20; *see also Bennett v. Spear*, 520 U.S. 154, 164-66 (1997).

Plaintiffs must demonstrate standing separately for each type of injury and form of relief sought in the action. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 185 (2000); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.") Looking to Plaintiff's claims in this action, the Court notes that Plaintiff's standing in this, or any Article III court, does not depend on his standing in state court. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985). "State courts may afford litigants standing to appear where federal courts would not, but whether they do so has no bearing on the parties' Article III standing in federal court." *Perry v. Brown*, No. 10-16696, 2012 WL 372713 at *30 (9th Cir. Feb.

7, 2012). But, although the federal standing inquiry does not depend on the merits of the plaintiff's causes of action, "it often turns on the nature and source of the claim asserted," regardless of whether that claim is brought under federal or state law. *Warth v. Seldin*, 422 U.S. at 501. Thus, in determining whether Plaintiff has standing in federal court, the Court must "consider [his] specific allegations and the relief" which he seeks. *Goode v. City of Philadelphia*, 539 F.3d 311, 316 (3d Cir. 2008) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-106 (1983)). Here, the Court can discern three distinct allegations which Plaintiff claims establish a justiciable case or controversy.[8] Generally applicable to each of these claims, Plaintiff asserts he has standing based on his status as a voter, arguing that Tri-City's actions against Director Horton deny him the Equal Protection of the Law guaranteed by the Fourteenth Amendment, which mandates equal representation. Thus, before looking to each of Plaintiff's claims individually, the Court briefly examines voter standing more broadly.[9]

Whether a citizen has standing to challenge a state action based on his interest as a voter is a complicated question that often turns upon the precise way in which the citizen alleges his right to vote has been implicated. On the one hand, a state's denial of its citizen's right to vote, although abstract in nature, can undoubtedly constitute an actual and concrete injury sufficient to confer standing upon the disenfranchised citizen. Landmark cases such as *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964), recognized voter standing to challenge unconstitutional electoral schemes in the context of state and federal elections. Indeed, the right to vote has been described as the *most* fundamental right possessed by an individual because it is preservative; all other rights, "even the most basic, are illusory if the right to vote is undermined."

---

[8] Plaintiff has stated four causes of action for: (1) declaratory relief under Cal. Code of Civ. Proc. § 1060 for a "declaration of rights" that the District may not continue the alleged illegal conduct; (2) waste or illegal expenditure of public funds under Cal. Code of Civ. Proc § 526a for an injunction to prevent the District from expending public money on the alleged illegal conduct; (3) denial of equal protection of the laws under 42 U.S.C. § 1983 and the Fourteenth Amendment based on state action taken by the District preventing Director Horton from meaningfully representing the voters who elected him; and (4) peremptory writ of mandate under Cal. Code Civ. Proc. § 1085 to compel the District to give Director Horton all of the rights, powers, and privileges to which he is entitled as a representative of the voters. (*See, generally*, Compl. ¶¶ 27-56.) Because many of Plaintiff's allegations overlap and are common to multiple claims, the Court finds it is more helpful to organize its standing analysis by the type of conduct rather than by claim.

[9] In asserting his claim for waste of public funds, Plaintiff additionally (or instead) claims taxpayer standing, which the Court also addresses separately below.

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  There is ample Supreme Court precedent establishing that voters have standing to bring federal actions challenging a wide variety of election and other voting-based injuries.  *Colgrove v. Green*, 328 U.S. 549 (1946) (voters who allege facts showing disadvantage to themselves as individuals, such as a violation of their right to have their vote counted, have standing to sue)*; see also Baker v. Carr*, 369 U.S. at 206-08 (underrepresented voters have standing to challenge apportionment scheme, based on a "citizen's right to a vote free of arbitrary impairment by state action"); *Reynolds v. Sims*, 377 U.S. at 554-55 (voters have standing to challenge malapportionment of state legislature voting districts).

A voter's standing to challenge representational harms has seemingly been so obvious at times that it has gone unquestioned.  *Baker v.* Carr, 369 U.S. at 206 ("Many of [our decisions] have assumed rather than articulated the premise [of voter standing] in deciding the merits of similar claims").  Examples of such cases abound.  *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486 (1969) (case brought by an elected Congressman and some voters of his district challenging his exclusion from the United States House of Representatives was justiciable although the voters' standing was not specifically addressed); *Anderson v. Celebreeze*, 460 U.S. 780 (1983) (voters and Presidential candidate successfully brought suit challenging the constitutionality of state's restrictions on candidates' ballot access; standing not mentioned); *Burdick v. Takushi*, 504 U.S. 428 (1992) (voter's claim that state's prohibition on write-in voting unconstitutionally inhibited the right to vote was rejected on the merits without discussion of standing).  However, cases not specifically addressing standing or some other jurisdictional defect do not establish the principle the defect was not present.  *See Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 266 (3d Cir. 2009) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998) (noting that the Supreme Court has "often said that drive-by jurisdictional rulings . . . have no precedential effect.")  Of course, these cases may influence the Court's understanding of voter standing, but they should not be cited for the proposition that the voters in each case in fact had standing.

Although voter standing has been broadly recognized, it is also clear that standing should not be recognized for every plaintiff claiming injury of his interest as a voter.  For instance, in

*United States v. Hays*, 515 U.S. 737, 745-56 (1995), the Supreme Court refused to hear a challenge to a state legislative redistricting plan on the grounds that the voter plaintiffs did not live within the racially gerrymandered district, even though all districts were impacted by the apportionment scheme.  The general interest in being free of an illegal electoral system was not a sufficiently individualized harm to confer standing.  *Id.*  Further, in *Lance v. Coffman*, 549 U.S. 437, 441 (2007), the Supreme Court unanimously held that four Colorado voters did not have standing to challenge a provision of the Colorado Constitution that allegedly deprived the state legislature of its responsibility to draw congressional districts under the United States Constitution.  Although the plaintiffs alleged a voter-related harm, the Supreme Court deemed it was not particularized, but rather an "undifferentiated, generalized grievance" that the law has not been followed, which is "quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Id.* at 442 (citing *Baker v. Carr*, 369 U.S. at 207-08).  Notably, the voters in *Lance* did not have standing even though they voted in the district where the governmental structure was being challenged as unconstitutional.

Thus, the Court must carefully examine whether Plaintiff has met his burden of establishing that his claimed injury is personal, particularized, concrete, and otherwise judicially cognizable.  As the body of voter standing jurisprudence indicates, Plaintiff must show how his averred injury is peculiar to himself, distinguished from an injury shared equally with his fellow citizens.  *See Lance*, 549 U.S. at 440.  Intertwined with this inquiry is the question of whether Plaintiff's claimed injury is redressable and, further, whether prudential standing considerations should bar the present suit.  With these concerns in mind, the Court now turns to each of Plaintiff's three distinct "injuries" in turn.

**1. Tri-City's Withholding Director Horton's "Rights" to Indemnity and Stipend**

Plaintiff objects to Tri-City's decision to sanction Director Horton by withholding his stipend for attendance at meetings during his censure, and determining that Tri-City would not indemnify Director Horton should he face liability based on whatever "misconduct" led to his censure. It is difficult to discern precisely under what theory Plaintiff believes these actions have injured him.  In his application for a temporary restraining order, Plaintiff asserts broadly that he,

1    and other similarly situated members of the public, "have an interest in the proper administration

2    of the District, the lawful expenditure of public money by the District's Board of Directors, and in

3    receiving equal treatment and protection of the laws." (Mot. for TRO 7.) However, the first two

4    of these three stated interests are just the sort of generalized grievance found insufficient to confer

5    standing in *Hays* and *Lance*, *supra*. The Supreme Court "repeatedly has rejected claims of

6    standing predicated on the right, possessed by every citizen, to require that the Government be

7    administered according to the law." *Valley Forge*, 454 U.S. at 476. The latter stated interest,

8    which invokes Plaintiff's interest in meaningful representation pursuant to the "right of qualified

9    voters . . . to cast their votes effectively," may present a potential source of standing, but Plaintiff

10   makes no convincing argument that this representational right is in any way implicated by Tri-

11   City's sanctions of Director Horton. (*See* Pl.'s Supp. Brief 4, 8.)

12       Plaintiff claims Tri-City has taken these punitive actions not for some legitimate purpose

13   but rather in retaliation against Director Horton in an effort to unlawfully chill his public speech in

14   violation of the First Amendment. However, this explanation only serves to emphasize the

15   particularity of the harm to Director Horton, who is not a party to this action.[10] Contrary to

16   repeated assertions that Plaintiff is capable of representing the interests of other similarly situated

17   voters, as well as those of Director Horton himself, Article III only allows him to assert *his own*

18   interests. None of the elements required for the assertion of third-party standing are present, such

19   as substantial obstacles to the third party asserting his own rights, *Barrows v. Jackson*, 346 U.S.

20   249 (1953) (plaintiff sued for breaching racially restrictive covenant allowed to assert rights of

21   black community members), or where there is a close relationship between the plaintiff and the

22   third party, *Craig v. Boren*, 429 U.S. 190 (1976) (bartender allowed to assert rights of male

23   

24       [10] Various explanations have been proffered for the absence of Director Horton from this
     lawsuit, none of which are fully satisfactory. Plaintiff states that "an action brought by Horton would
25   be self-defeating," the meaning of which eludes. (Page Supp. Decl. 4.) Director Horton offers
     different reasons. Most recently, he explained: "I do not possess the financial resources or legal
26   expertise to prosecute this lawsuit. I, therefore, support Mr. Page in his effort to address the District's
     illegal interference with my official duties and urge this Court to recognize Mr. Page as possessing
27   sufficient interests to support his standing as plaintiff. I believe Mr. Page will continue to effectively
     represent the interests of me and my constituents, as well as his own." (Horton Supp. Decl. ¶ 6, ECF
28   No. 9-2.) Both Mr. Page and Director Horton were present at oral argument on March 1, 2012, at
     which time no further explanation was given.

1  customers subject to discriminatory alcohol law).  Nor has Plaintiff argued such an exception to

2  the general prohibition against third-party standing should apply here.  Instead, Plaintiff has made

3  at best a half-hearted attempt to argue that his constitutional right to equal representation extends

4  to protect against the "debasement" of his vote by denying his representative "the same rights,

5  privileges, and powers afforded to other duly-elected Members of District's Board of Directors."

6  (Pl.'s Supp. Brief 4, 7.)  Plaintiff cites no authority for the proposition that a voter has a right to or

7  interest in the provision of salary and other benefits personal to his representative.

8         To the extent that they are even legally protected, Director Horton's "rights" to

9  indemnification and stipend are surely personal to him.  *See, e.g.*, *Powell v. McCormack*, 395 U.S.

10  486 (1969) (member of Congress has interest in back pay as a result of exclusion); *Synar v. United*

11  *States*, 626 F. Supp. 1374, 1380 (D.D.C.), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714 (1986)

12  (members of Congress have interest in statute that would limit their salaries).  The only injury

13  Plaintiff credibly alleges here is that the law has not been followed.  He has no more particularized

14  stake in the Board's sanctions of Director Horton than any voter asserting a generalized grievance

15  against governmental conduct of which he or she does not approve.  Thus, the Court finds Plaintiff

16  has failed to show he has suffered a legally cognizable injury with regard to Director Horton's

17  indemnification and stipend.

18  **2.  Tri-City's Expenditure of Public Funds to Prevent Director Horton from Attending**

19  **Closed Session Meetings**

20         Similarly, Plaintiff has not met his burden of showing a particularized interest in Tri-City's

21  alleged expenditure of public funds to prevent Director Horton from attending closed session

22  meetings, as a voter or a taxpayer.  In his supplemental briefing, Plaintiff clarifies that he does not

23  contend California's "taxpayer standing" statute, Cal. Code Civ. Proc. § 526a, or any other state

24  law, confers standing upon Plaintiff to sue in federal court.  (Pl.'s Supp. Brief 6.)  Rather, Plaintiff

25  asserts the general prohibition against taxpayer standing is relaxed or eliminated in the context of

26  municipal taxpayers.  (*Id.*)

27         It is well established that "[a]bsent special circumstances, . . . standing cannot be based on

28  a plaintiff's mere status as a taxpayer."  *Arizona Christian School Tuition Organization v. Winn*,

563 U.S. —, 131 S.Ct. 1436, 1441 (2011). The foundation for this general prohibition was established in *Frothingham v. Mellon*, 262 U.S. 447, 486-87 (1923) (decided with *Massachusetts v. Mellon*), which explained that a federal taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain" that standing for such plaintiffs is generally not proper. The Supreme Court found that any government action "likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern." *Id.* at 487. The same logic applies to state taxpayers. *DaimlerChrysler Corp.*, 547 U.S. at 345. However, municipal taxpayers, a group of citizens one step further confined, are potentially distinguishable.

Under this "municipal taxpayer standing" exception articulated in *Frothingham*, resident taxpayers have standing in some circumstances to challenge an illegal expenditure of money by a municipal organization. *Frothingham*, 262 U.S. at 486. "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Id.* The rationale behind granting standing to a single taxpayer in such cases relies upon the "particular relation of the corporate taxpayer to the [municipal] corporation" making the municipal taxpayer's potential injury more direct. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (quoting *Frothingham*, 262 U.S. at 486-87). In considering *Frothingham*'s seminal formulation of the taxpayer standing doctrine, *Doremus v. Board of Education of Borough of Hawthorne*, 342 U.S. 429, 434 (1952), emphasized that a taxpayer "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some *direct injury* as a result of its enforcement[.]" (internal quotations and citations omitted) (emphasis added). *Doremus* denied taxpayer standing because the action was not "a good-faith pocketbook" challenge to the state statute at issue.[11]

---

[11] As recently noted by the District Court of Arizona, although *Doremus* has been "repeatedly construed . . . as a state-taxpayer case," *Smith v. Jefferson County Bd. of School Com'rs*, 641 F.3d 197, 211-212 (6th Cir. 2011) (citing cases), *Doremus* could quite reasonably be read as addressing municipal taxpayer standing. *We Are America/Somos America v. Maricopa County Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1106 n.14 (D. Ariz. 2011).

The Ninth Circuit has repeatedly applied the *Doremus* standard to municipal taxpayer standing cases.  *See, e.g., Cammack v. Waihee*, 932 F.3d 765, 770 (9th Cir. 1991).  Recently, in *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 786 (9th Cir. 2008), the Ninth Circuit additionally applied *Daimler-Chrysler, supra*, to conclude that "plaintiffs do not have standing as municipal taxpayers [if they do] not suffer[] a 'direct dollars-and-cents injury.'" (quoting *Doremus*, 432 U.S. at 434).  *Barnes-Wallace* also held that "municipal taxpayers must show an expenditure of public funds to have standing."  *Id.*

Here, the municipal taxpayer standing doctrine appears potentially applicable.  The Tri-City Health Care District is governed by California Health and Safety Code section 32001, which establishes districts as "municipal corporations."  However, Plaintiff, who is a taxpayer in this municipal district, and thus likened to a shareholder of this District corporation, has not shown an expenditure of public funds.  Plaintiff has provided no evidence indicating how much money has been spent specifically to exclude Director Horton from meetings, or where the funds came from. It is possible that any expenditures were made directly out of the Hospital's revenue or that security guards were merely repurposed at no loss to taxpayers.  Thus, Plaintiff has made no showing of a "direct dollars-and-cents" injury based on the Board's spending municipal funds to exclude Director Horton from meetings.  The possibility that he, or any municipal taxpayer, will receive any direct pecuniary relief from this lawsuit is "remote, fluctuating and uncertain," and consequently the claimed injury is not "likely to be redressed by a favorable decision."  *ASARCO*, 490 U.S. at 614 (quoting *Frothingham*, 262 U.S. at 487; *Valley Forge*, 454 U.S. at 472).  Plaintiff has not even shown that the District has the power to tax or has control over any municipal taxpayer funds received.

Without making such showings, Plaintiff lacks standing to challenge Tri-City's expenditure of public funds on private security personnel to exclude Director Horton from meetings.

**3. Tri-City's Exclusion of Director Horton from Participation in Closed Session Meetings**

Lastly, Plaintiff argues Tri-City's allegedly arbitrary (or retaliatory) exclusion of Director Horton from participation and voting in closed session meetings violates his individual right to

1    vote effectively and to meaningful representation under the Equal Protection Clause of the

2    Fourteenth Amendment, as established in *Anderson*, 460 U.S. at 787.  (*See* Pl.'s Supp. Brief 4-5.)[12]

3    Although this argument presents a closer question, ultimately the Court finds Plaintiff has not

4    alleged a sufficiently personal, particularized, and concrete injury to confer standing.  Further,

5    concerns about redressability and prudential considerations render Plaintiff's claims unsuitable for

6    adjudication by this Court.[13]  The policy underlying the prohibition against generalized grievances,

7    which seeks to "guarantee that courts fashion remedies no broader than required by the precise

8    facts to which the court's ruling would be applied . . . [and] ensure[ ] that courts exercise power

9    that is judicial in nature," *Lance v. Coffman*, 549 U.S. at 441, applies directly to the case at hand

10   and compels the Court to decide that it cannot hear this suit.

11        In *Bond v. Floyd*, 385 U.S. 116 (1966), the Supreme Court was faced with an analagous

12   voter challenge of an elected representative's exclusion from a state legislature based on his public

13   statements in opposition to the Vietnam War.  Although similar, *Bond* is distinguishable in several

14   key respects.  First, Bond, the excluded representative, was himself a party to the action.  Second,

15   after the state legislature's vote to exclude Bond, the Governor called a special election to fill the

16   vacant seat.  *Id.* at 128.  Interestingly, Bond also won that special election "over-whelmingly."  *Id.*

17   Bond declined to recant his earlier statements, and was again prevented from taking the oath of

18   office.  *Id.*  The seat apparently remained vacant throughout his entire original term, and he sought

19   "re-election" in the next regular election, again winning by a large margin.  *Id.*  In holding the

20   _____

21        [12] Plaintiff also alleges that the District's exclusion of Director Horton violates the First
     Amendment.  Assuming he means to apply a representational injury theory to this allegation as well,
22   the Court finds it similarly insufficient.  For the same reasons that he lacks standing to assert a claim
     for representational injury based on the restriction of his representative's ability to meaningfully
23   represent him, as discussed below, he also lacks standing to assert the retaliatory censorship of his
     representative's political speech.

24

25        [13] Tri-City also argues that Plaintiff's claims as to Director Horton's exclusion are moot
     because the censure period is over.  (Opp'n 14.)  In *Alejandrino v. Quezon*, 271 U.S. 528, 534 (1926),
26   cited by Tri-City in support of this proposition, the Supreme Court deemed a case moot where the
     Philippine Senator's period of suspension had expired, and he had begun to exercise his functions as
27   a member of the Senate.  Here, although the censure period is over, Plaintiff alleges the Board
     essentially has "a near blanket exclusion" policy regarding Director Horton's presence at closed
28   session meetings based on his ongoing refusal to sign a confidentiality pledge.  Thus, the Court finds
     the alleged harm is not moot, and that at the very least this case presents a typical issue "capable of
     repetition, yet evading review."  *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974).
     *See also Davids v. Akers*, 549 F.2d 120 (9th Cir. 1977).

exclusion violated the First Amendment, Chief Justice Warren declined to decide whether it also violated the Constitution's guarantee of a republican form of government, or whether the excluded representative's constituents had standing to sue, because the case could be decided based on the representative's First Amendment claims alone. *Id.* at 137 n.14 ("We express no opinion on the question of whether Bond's constituents can claim that concrete adverseness which would be necessary to give them standing.")[14]

The Supreme Court similarly avoided the issue of voter standing to challenge a representative's exclusion in *Powell v. McCormack*, 395 U.S. 486 (1969).  In determining that the U.S. House of Representatives was without power to exclude Powell, a duly elected Congressman, from his membership in the House, the distinction between exclusion and expulsion was important.[15]  Partly this distinction was important because Article I grants the House authority to expel a member for any reason with a two-thirds vote, but specifically prescribes the qualifications it may consider in excluding a member.  *Powell*, 395 U.S. at 507, 550.  However, other differences between exclusion and expulsion more relevant to the case at hand were noted as well.  For example, a representative whose expulsion is contemplated may participate in the debate while a representative-elect does not have that right.  *Id.* at 510 n.30.  In his concurrence, Justice Douglas wrote that this "is not an expulsion case.  Whether it could have been won as an expulsion case, no one knows.  Expulsion for 'misconduct' may well raise different questions, different considerations." *Id.* at 553 (Douglas, J., concurring).  And a legislative body's power to sanction its members was still further differentiated from both exclusion and expulsion.  The body's "interest in preserving its institutional integrity . . . can be sufficiently safeguarded by the exercise

---

[14] Notably, the district court in *Bond* had dismissed the complaint as to Bond's constituents because they did not allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues necessary in determining constitutional questions," citing *Barry v. United States ex rel. Cunningham*, 279 U.S. 597 (1929) for the proposition that a temporary deprivation of equal representation in a legislative body is not a sufficient injury to confer standing.  *Bond v. Floyd*, 251 F.Supp. 333, 338-39 (N.D. Ga. 1966).

[15] Quoting from Judge McGowan's opinion below, the Court explained: "Powell was 'excluded' from the 90th Congress, i.e., he was not administered the oath of office and was prevented from taking his seat.  If he had been allowed to take the oath and subsequently had been required to surrender his seat, the House's action would have constituted an 'expulsion.'" *Powell*, 395 U.S. at 507 n.27.

of its power to punish its members for disorderly behavior and, in extreme cases, to expel a

member." *Id.* at 548.  Ultimately, the Court did not address explicitly whether voters had standing

to challenge a legislator's exclusion, instead finding broadly that the case was justiciable.  *Id.* at

517, 550.

Under the definitions set out in *Powell*, the Board's actions here neither excluded nor

expelled Director Horton.  Rather, even accepting all of Plaintiff's allegations as true, the Board

sanctioned him by preventing him from discussing and in some cases voting on some of the issues

before it.  Although Plaintiff asserts that barring a Board member from participating in any part of

session goes to his core duty as a representative and thus constitutes a constructive removal from

office, it cannot be contested that the bar to Director Horton's participation was not complete.

Director Horton is still a participating member of the Board of Directors.  Indeed, he was even

allowed to participate in the vote on his own exclusion, but chose to abstain.

Perhaps more relevant to the instant action is that Plaintiff was never denied meaningful

representation on the Board.  Given the at-large multi-vote election system employed by the

District, each of the elected Directors represents each District resident.  Plaintiff has not been

singled out for specially unfavorable treatment because he voted for Director Horton.  As the

Ninth Circuit has stated,

> [i]n theory at least, and very often in fact, each candidate elected represents all of
> the people of his district who voted for him, those who voted against him, those
> who chose not to vote, those who were not eligible to vote.  He does not represent
> just or only the voters who voted for him, or those who are members of his political
> party.

*Davids v. Akers*, 549 F.2d 120, 124 (9th Cir. 1977).  Otherwise, a citizen who voted only for losing

candidates would have no cognizable interest in the actions of his representatives.  *Davids* clearly

rejected lines of reasoning undermining this principle.  *Id.* at 124-25 (questioning and dismissing

the idea that citizens, "by voting for losers, cease to be 'persons' under the Fourteenth Amendment

for the purpose of transmitting their rights.")  Plaintiff essentially admitted the problem this creates

for his establishing a particularized injury at oral argument, when he emphasized that the class the

Board has discriminated against is not just the 25,508 citizens who voted for Director Horton, but

*all* District residents, under the theory that "the public itself is entitled to have a full compliment of

Directors."  But "even in a proceeding which he prosecutes for the benefit of the public . . . [the plaintiff] must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens."  *Lance v. Coffman*, 549 U.S. at 440 (quoting *Tyler v. Judges of Court of Registration*, 179 U.S. 405, 406 (1900)).  Here, where all seven elected officials represent all District residents, and those seven members voted to exclude one member from certain items of business, Plaintiff's claimed injury is far more amorphous and generalized than in voting rights cases where the Supreme Court has found standing.

Notably, courts in other districts have granted voter standing in similar, but ultimately distinguishable, situations.  In these cases, not only were the representatives themselves also parties to the action, but the exclusions at issue forming the basis for the asserted injury were far more particularized.  In *Kucinich v. Forbes*, 432 F.Supp. 1101, 1116 (N.D. Ohio 1977), the court found a voter had standing to raise the issue of his loss of representation due to the suspension of his representative because the suspension established two classes of voters: those who had representation on the City Council, and those who did not.  The court invalidated a similar exclusion from a state senate's political caucus in *Ammond v. McGahn*, 390 F.Supp. 655 (D.NJ 1975), *rev'd on other grounds.*  In finding these cases unpersuasive, the Court notes first that neither decision analyses voter standing, but instead merely cursorily states its existence. Second, unlike in the case at bar, the representatives in *Kucinich* and *Ammond* had been completely, not partially, suspended from participation, and that complete suspension discriminated against an articulable group of voters.  In contrast, here no group of voters had been harmed because, as discussed above, all seven of the Board's members represent all District voters, regardless of whether each individual voter placed a vote for that member.  Consequently, Plaintiff can only assert an injury to his general interest, common to all District residents, in having the Board follow the law.

Moreover, other courts have indicated the impropriety of granting standing in analagous circumstances.  For example, in *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249 (3d Cir. 2009), voters and residents lacked standing to assert their challenge of a legislative process that led to the passage of a statute that increased salaries for state legislators.  Noting the

12cv198

decision in *Ammond*, the Third Circuit held that even if it were to adopt the reasoning that citizens have an equal protection right to have their elected state representatives be given full opportunity to participate in drafting, debate, and amendment of bills increasing salaries, the citizens in that case asserted only an abstract, generalized grievance common to all Pennsylvania citizens. *Id.* at 268. Similarly, in *Dillard v. Chilton County Commission*, 495 F.2d 1324 (11th Cir. 2007), voter citizens lacked independent standing to intervene in an action challenging an increase in size of the county board of commissioners and the implementation of cumulative voting based on their asserted right to equal protection. In *Dillard*, the Eleventh Circuit overturned its previous ruling that a voter's assertion of his or her "interest in a democratically selected form of government describes a concrete and particularized injury sufficient to confer standing," determining instead that *Lance v. Coffman*, *supra*, required finding such voters asserted only a generalized grievance. *Id.* at 1330. These cases provide persuasive support for the conclusion that the circumstances currently presented do not establish an injury sufficiently particularized to establish constitutional standing.

In addition to his inability to allege a sufficiently personal, particularized and concrete injury, it is difficult to see how Plaintiff's claimed injury would be redressable by a favorable decision. In *Davids v. Akers*, *supra*, the Ninth Circuit denied a voter's challenge of a state legislature's internal standing committee appointments decisions as being biased in favor of one political party. The plaintiffs in that case, representatives and voters, argued that the legislature's exclusion of a disproportionate number of members from one political party from certain committees violated voters' right to equal protection. In a powerfully worded opinion, the court disagreed, in large part objecting to the remedy sought:

> We have a strong feeling that if this court were to undertake to grant to plaintiffs the relief that they seek, our action would set the sometimes canonized and frequently capitalized Founding Fathers, as well as the Framers and Supporters of the Fourteenth Amendment, spinning in their graves. To us, the picture of a Federal Judge undertaking to tell the Speaker of the Arizona House of Representatives [how to appoint members to committees] is startlingly unattractive. . . . Running to a Federal Judge for an injunction or a declaratory judgment requiring the Speaker to put the plaintiff or his colleagues on committees is a perversion of the judicial process into a political process. We are against it.

*Davids v. Akers*, 549 F.2d at 123-24. Although this case admittedly presents a situation of a

different degree than committee appointments, the Court finds the remedy requested here similarly untenable. Plaintiff does not dispute the Board's inherent authority to discipline its members or to exclude certain members from certain meetings based on confidentiality, conflicts, or other legitimate concerns. In fact, he states that he "is not, for example, seeking to prevent District from passing further censure resolutions concerning Director Horton, should the Board of Directors choose to do so." (Pl.'s Supp. Brief 7.) And yet he asks the Court to enjoin the Board from excluding Director Horton from closed session meetings and from denying him the same "rights, privileges, and powers" afforded to other members.[16] (*Id.*) The Court cannot see how such statements, if they can even be reconciled, point to a fashionable remedy.

Further, even if Plaintiff established standing under Article III, he cannot satisfy the prudential standing and other justiciability concerns which counsel against adjudicating claims on behalf of third parties and "abstract questions of wide public significance" most appropriately addressed in the representative branches. *See Valley Forge*, 454 U.S. at 454-55. In policing its own ethics violations, the Board engages in a core legislative activity. Courts have held that, absent "truly exceptional circumstances," such legislative activity is not actionable in federal court. *Whitener v. McWatters*, 112 F.3d 740, 744 (4th Cir. 1997) (holding that county board of supervisors acted in its legislative capacity when it voted to discipline a member, and thus his action against the board was barred by absolute legislative immunity, citing the "well-established principle that legislatures may discipline members for speech" without executive or judicial reprisal for doing so). As Justice Frankfurter explained, courts traditionally

> leave intra-parliamentary controversies to parliaments and outside the scrutiny of law courts. The procedures for voting in legislative assemblies—who are members, how and when they should vote, what is the requisite number of votes for different phases of legislative activity, what votes were cast and how they were counted—surely are matters that not merely concern political action, but are of the very essence of political action, if "political" has any connotation at all. . . . In no sense are they matters of "private damage." They pertain to legislators not as individuals but as political representatives executing the legislative process. To

---

[16] At oral argument, Plaintiff attempted to further refine his request for injunctive relief, stating that a narrower remedy would be to order the Board to "stop the last-minute votes excluding Director Horton from the sessions." However, this remedy seems more aimed at protecting some due process right to attend closed session meetings. Requiring the Board to give notice before its ad-hoc exclusion would hardly remedy the alleged equal protection injury based on the absence of the "full complement of Directors" at each meeting.

open the law courts to such controversies is to have courts sit in judgment on the
manifold disputes engendered by procedures for voting in legislative assemblies.

*Coleman v. Miller*, 307 U.S. 433, 469-70 (1939) (Frankfurter, J., concurring).  Although Justice

Frankfurter was writing in the context of the justiciability of a legislator suit, his reasoning applies

here as well.  If Plaintiff were allowed to bring this suit, then every constituent believing his

legislator had been mistreated by the legislative body would have a forum to air his grievances

about the internal procedures of the legislative body in federal court.  Neither the structure nor the

strictures of the Constitution allow such a result.

Plaintiff cites recent Supreme Court opinions in *Nevada Commission on Ethics v.

Carrigan*, — U.S. —, 131 S.Ct. 2343 (2011) and *Raines v. Byrd*, 521 U.S. 811 (1997) for the

proposition that an elected official's power belongs to the people, and that a legislator acts and

votes in his legislative capacity "as a trustee for his constituents, not as a prerogative of personal

power."  *Raines*, 531 U.S. at 821.  (Pl.'s Supp. Brief 5.)  Indeed, Justice Frankfurter's words,

quoted above, also articulate this point.  Plaintiff correctly emphasizes the interconnected nature of

the rights of voters and the rights of candidates or elected officials.  *See Burdick v. Takushi*, 405

U.S. 428, 438 (citing *Bullock v. Carter*, 504 U.S. 134, 143 (1972).  However, the same cases to

which Plaintiff points actually undermine his contention that he has presented a justiciable case

and controversy here.  Both *Carrigan* and *Raines* support the Court's conclusion that a voter

plaintiff must present a *concrete* and *particularized* injury of his right to vote, not merely a general

allegation that a representative's rights in his legislative role have been impinged.  To the extent

that it is relevant to the current case at all, *Carrigan*'s holding that a city council's censure of a

member based on his failure to recuse himself did not violate his constitutional rights supports a

broad understanding of inherent legislative authority to sanction based on a member's speech.

And in finding individual members of Congress did *not* have standing because their alleged

voting-related injury was insufficient, *Raines* reiterated that it is the role of Article III courts to

protect "the constitutional rights and liberties of individual citizens and minority groups against

oppressive or discriminatory government action.  It is this role, not some amorphous general

supervision of the operations of government, that has maintained public esteem for the federal

courts and has permitted the peaceful coexistence of the countermajoritarian implications of

1   judicial review and the democratic principles upon which our Federal Government in the final

2   analysis rests." *Raines*, 521 U.S. at 829 (quoting *United States v. Richardson*, 418 U.S. at 192

3   (Powell, J., concurring)).

4       This vital conception of the role of federal courts operates to bar the present case as well.

5   Plaintiff has not identified a government action that has oppressed or discriminated against him or

6   a class of voters.  "The standing doctrine . . . derives from the interests in ensuring that parties

7   have the proper incentives to litigate cases as vigorously as they can and in avoiding adjudication

8   of generalized grievances that are better resolved through the legislative process."  *Lee v.*

9   *American Nat'l Ins. Co.*, 260 F.3d 997, 1005 (9th Cir. 2001).  Here, Plaintiff alleges an abstract

10  and widely dispersed institutional injury and asks the Court to engage in general oversight of an

11  elected branch of government, contrary to historical experience and constitutional requirements.

12  The Court concludes that it cannot do so.

13  **CONCLUSION**

14      For the foregoing reasons, the Court finds Plaintiff does not have standing to bring his

15  federal claim.  Accordingly, the Court has no subject matter jurisdiction over this case, and its

16  removal was improper. Where a plaintiff in a removed action lacks federal standing to sue, the

17  action should generally be remanded, not dismissed.  *See* 28 U.S.C. § 1447(c) ("If at any time

18  before final judgment it appears that the district court lacks subject matter jurisdiction, the case

19  shall be remanded"); *see also Doe v. Match.com*, 789 F. Supp. 2d 1197, 1199 (C.D. Cal. 2011)

20  (finding the plaintiff did not have Article III standing in considering preliminary injunction and

21  remanding the complaint to state court) (citing cases).  As noted above, Plaintiff's standing in this,

22  or any Article III court, does not depend on his standing in state court, and "[s]tate courts may

23  afford litigants standing to appear where federal courts would not."  *Perry v. Brown*, No. 10-

24  16696, 2012 WL 372713 at *30 (9th Cir. Feb. 7, 2012).[17]  Thus, the Court **REMANDS** this case,

25  

26      [17] Tri-City objected to the Court's remanding the case at oral argument, but admitted that
California courts have "lower" standing requirements and stated that the "narrow issue" of waste of

27  public funds for the security guards could likely go forward in state court under Cal. Code Civ.
Proc. section 526a.  In support of its contention that Plaintiff would have similar standing issues in

28  state court, Tri-City submitted a supplemental notice of authority, citing to a decision of the California
Court of Appeal issued the same day oral argument in the present case was held.  (ECF No. 17.)
However, that case, *Fuller v. Bowen*, 2012 WL 663157 at *5 (Cal. App. March 1, 2012), decided the

1   including all pending motions, to the Superior Court of California for the County of San Diego.[18]

2   The Clerk shall close the file.

3       **IT IS SO ORDERED**.

4

5   DATED:  March 19, 2012

6   _Janis L. Sammartino_
    _____
    Honorable Janis L. Sammartino
7   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   narrow issue of whether the court had jurisdiction to "judge the qualifications and elections of
     candidates for membership in the Legislature," concluding that it did not.  The Court does not read
23   *Fuller* as precluding this case, which neither concerns the state senate nor was brought by an
     individual seeking election to the state legislature.  Thus, the Court declines to reach the issue of
24   which of Plaintiff's claims may be brought properly under state law in state court, finding that issue
     better addressed by the state court itself.

25       [18] At oral argument, Plaintiff did not contest that Tri-City's pending Anti-SLAPP motion
26   would remain even if the Court dismissed the case.  The Court agrees that the dismissal of the
     underlying action does not ordinarily moot an Anti-SLAPP motion, because of its provision for
27   attorney's fees and costs.  *Collins v. Allstate Indem. Co.*, 428 Fed. Appx. 688, 690 (9th Cir. 2011).
     However, in light of the Court's decision to remand the case to state court, that motion is properly
28   considered by the state court.  *See, e.g., Briarwood Capital, LLC v. KBR Group, LLC*, 2010 WL
     1525453 at *4 (S.D. Cal. April 14, 2010) (declining to rule on pending motions, including an Anti-
     SLAPP motion, where the case was remanded to state court).

12cv198